# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**JULIA EVANS,**                                        )
                                                        )
          **Plaintiff,**            )
                                                        )
      **v.**                                )     **Civil Action No.  09-875 (ESH)**
                                                        )
**DISTRICT OF COLUMBIA,**                               )
                                                        )
          **Defendant.**            )
_____ )

## MEMORANDUM OPINION

Plaintiff Julia Evans claims that her employer, the District of Columbia Department of Environment ("DDOE"), discriminated against her on the basis of her sex and/or national origin and retaliated against her for engaging in protected activity by significantly reducing her job-related responsibilities, denying her request for a non-competitive promotion, not filling a listed vacancy to prevent her obtaining a competitive promotion, and giving her a poor performance evaluation.  Plaintiff claims violations of both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. and the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.  Defendant has moved for summary judgment on all claims (Def.'s Mot. for Summ. J., July 12, 2010).  For the reasons stated herein, defendant's motion will be granted as to plaintiff's claims based on the denial of a non-competitive promotion and on her performance evaluation, but denied as to all remaining claims.

# BACKGROUND

I.      **FACTS**[1]

    A.      **June 2006-May 2007**

In June 2006, the District of Columbia Department of Health hired plaintiff, a Hispanic woman of Peruvian origin, as an "environmental specialist" in its "Non-point Source Management Branch" of the "Watershed Protection Division."  (Pl.'s Statement of Material Facts ¶¶ 3,5, Sept. 3, 2010 ("Pl.'s SMF"); Def.'s Mot. for Summ. J., Ex. G (Decl. of Fitzgerald Fant), ¶ 6 & Att. 3, May 12, 2009 ["Fant Decl."].)[2]  Plaintiff, who had a bachelor's degree in civil engineering from Ricardo Palma University in Lima, Peru, and a master's degree in environmental engineering from Johns Hopkins University, was hired at grade 11, step 4.  (Pl.'s SMF ¶¶ 3, 17-18;  Fant Decl. ¶ 6 & Att. 3).  Her immediate supervisor was Sheila Besse; Besse's immediate supervisor was Hamid Karimi.  (Pl.'s SMF ¶ 4.)

In mid to late 2006, the District of Columbia established the Department of Environment as an independent agency.  (*Id.* ¶ 1 & n.1)  The restructuring that followed included transferring the Watershed Protection Division from the Department of Health to the Natural Resources Administration in the Department of Environment, renaming the Non-Point Source Management Branch the Planning and Restoration Branch and creating the Storm Water Management Division to take over storm water management from the Water and Sewer Authority.  (*Id.* ¶¶ 1 n.1, 5.)  During this "transition period," from approximately July 2006 to March 2007, plaintiff's

---

[1]As this matter is before the Court on defendant's motion for summary judgment, the facts are presented in the light most favorable to the plaintiff.

[2]The Watershed Protection Division was part of the Bureau of Environmental Quality in the Environment Health Administration of the Department of Health.  (Pl.'s SMF ¶¶ 3,5.)

duties included helping establish the new Storm Water Management Division, assisting in the transfer of storm water management to that division, reviewing and commenting on plans for a restoration project, and assisting the Inspection and Enforcement Branch with data management of storm  water management devices.  (*Id.* ¶¶ 7, 9.)  Plaintiff also voluntarily undertook the responsibility for managing the "municipal separate storm sewer system permit" (the "MS4 permit").  (*Id.* ¶ 8.)

For the period from June 2006-May 2007, plaintiff consistently received ratings of "outstanding" from Besse and extremely positive evaluation comments.  (*Id.* ¶ 26; Pl.'s Opp. to Def.'s Mot. for Summ. J. ["Pl.'s Opp."], Ex. 7, Sept. 3, 2007.)

**B.**    **May 2007-September 2007**

In May 2007, plaintiff applied and was selected for a position as an "environmental engineer" in the newly-established Storm Water Management Division.  (Pl.'s SMF ¶ 11; Pl.'s Opp., Ex. 8 (Notification of Personnel Action); Def.'s Mem. in Support of Mot. for Summ. J. ["Def.'s Mem."], Ex. F (Decl. of Hamid Karimi) ¶ 3 ["Karimi Decl."], July 12, 2010; Fant Decl. ¶ 7 & Att. 1.)  Plaintiff was appointed at grade 12, step 1, a promotion from her grade 11 position as an "environmental specialist."  (Pl.'s SMF  ¶ 11.)  Her new position was classified as grade 12/13, indicating the potential for a non-competitive promotion to grade 13. (*Id.* ¶ 11.)

Initially, plaintiff was the only employee in the Storm Water Management Division.  (*Id.* ¶ 13.)  As no division head was in place when plaintiff began, her direct supervisor was Karimi, the head of the Natural Resources Administration (which included the Storm Water Division); indirectly she also continued to be supervised by Besse, who remained the head of the Watershed Protection Division.  (Pl.'s SMF ¶ 12.)

From May until early September 2007, plaintiff was the only employee in the Storm Water Management Division.  (Pl.'s SMF ¶ 13.)  During this period, plaintiff's duties included: (1) regularly meeting with Karimi to discuss and implement MS4 permit administration; (2) assisting Karimi and Besse in redeveloping the MS4 budget; (3) assisting DDOE counsel in MS4 permit negotiations in response to a challenge to DDOE's MS4 permit, including developing a Letter of Agreement between EPA and the District to enhance storm water management in the District; (4) regularly meeting with Karimi and Besse for personnel planning, which included reviewing the position descriptions for the Storm Water Division Administrator and an environmental specialist, providing input on questions for candidate interviews, reviewing candidate resumes, and interviewing candidates for an environmental specialist position; (5) serving as the MS4 contact within DDOE and for external agencies, including EPA; (6) overseeing other agencies' compliance with obligations funded by the MS4 permit, including reviewing and approving invoices for payment; (7) overseeing the work of an external contractor hired to write a study for restructuring storm water management in the District; (8) reviewing invoices from, and the work provided by an outside consultant under a pre-existing contract to administer and implement the MS4 program; (9) meeting with other District agencies about the MS4 permit and taking part in an official visit to Portland, Oregon; (10) writing a sole-source contract for outside counsel through the Office of Contracts and Procurement; (11) supervising work provided by a technical contractor; (12) developing a matrix to determine maintenance needs for water quality catch basins installed by District Department of Transportation ("DDOT"); (13) initiating the first project to track deliverables from divisions within DDOE; (14) assuming management of a project to install a storm water management device to comply

with MS4 permit obligations; and (15) assisting in writing and editing required reports.  (Pl.'s Opp., Ex. 1 (Aff. of Julia Evans) ¶ 11 ["Evans Aff."] .)

In September 2007, Karimi hired Jonathan Champion as an "environmental specialist" for the Storm Water Management Division.  (Def.'s Mem., Ex. E (Notification of Personnel Action).)  Champion, a white male, had a college degree and was working on his master's degree, but he was not an engineer.  (Pl.'s SMF ¶¶ 14, 15; Evans Aff. ¶ 14.)  He was the second employee hired for the division after plaintiff, and he was hired at grade 11, step 4.  (Def.'s Mem., Ex. E.)  Shortly after Champion was hired, Besse assigned him to assist two male employees, who worked under her in the Watershed Protection Division, rather than to assist plaintiff.  (Pl.'s SMF ¶ 29.)

### C.    October 30, 2007:  Plaintiff's First Complaint to Karimi

On October 30, 2007, plaintiff complained to Karimi that she was being treated less favorably than her male co-workers in the resources that were made available to her.  (Pl.'s SMF ¶ 29.)  Her particular complaint arose out of Besse's decision to assign Champion to work with two male employees in the Watershed Protection Division, despite the fact that there was a substantial amount of work to do in the Storm Water Management Division where plaintiff was the only other employee.[3]  (Id.)  Karimi responded by telling plaintiff that he would hire a grade

_____

[3]According to plaintiff, her complaint was also "precipitated" by earlier events that led plaintiff to believe that Besse was discriminating against her because she was female and/or Hispanic.  (Pl.'s SMF at 4.)  These events included: (1) in the fall of 2006, plaintiff overheard Besse state that she does not like to work with women because they get into cat fights (Pl.'s SMF ¶ 22); (2) when plaintiff was in the Watershed Protection Division, Besse had regular meetings with the male environmental specialists but only rarely had one-on-one meetings with her (id. ¶ 23);  (3) Besse assigned male employees in the Watershed Protection Division assistance and resources when they requested it, while denying plaintiff similar resources (id. ¶¶ 24, 25, 27, 29); (4) during plaintiff's August 2007 meeting with Besse to go over her annual performance

9 employee to assist her. (*Id.* ¶ 30.)

**D.     Post-October 30, 2007 Reduction of Duties**

After plaintiff's meeting with Karimi, Besse stopped speaking to her or e-mailing her for the next three to four months. (*Id.* ¶ 31.) Karimi, in addition to not hiring a grade 9 employee to assist plaintiff (*id.* ¶ 30),[4] took a number of actions in late 2007 and early 2008 that reduced plaintiff's duties and responsibilities. Those actions included: (1) he ceased meeting with her on a regular basis – indeed, he rarely interacted with her, although he continued to meet regularly with Champion (*id.* ¶ 31); (2) he began reassigning plaintiff's MS4 and other high-profile duties to Champion (*id.* ¶ 40); (3) he excluded her from discussions regarding personnel and strategic planning for the Storm Water Management Division (*id.* ¶ 48); (4) he removed her from writing a conference paper for an upcoming high visibility green roof conference, even though plaintiff had drafted the abstract for the paper with Karimi and Champion, and when plaintiff objected, he gave her only limited review and editing responsibilities (Evans Aff. ¶ 23); (5) he discouraged plaintiff's participation, but included Champion, in the work and meetings of the storm water management task force established by a City Council member in November 2007 (*id.* ¶ 25); and (6) he assigned Champion the lead on coordinating the MS4 task force (*id.* ¶ 24).

---

evaluation, Besse told her that she was not "lazy" like another male Hispanic employee or "crazy" like a female African-American employee (id. ¶ 26); and (5) during that same meeting, Besse asked plaintiff to help her encourage Peter Hill, a male employee, to take on Besse's position as head of the Planning and Restoration Branch when Besse moved to head the Watershed Protection Division. (*Id.* ¶ 26.) None of these events, however, forms the basis for plaintiff's claims of discrimination and retaliation. (*Id.* ¶ 22.)

[4]Plaintiff made no attempt to follow up with Karimi about hiring a grade 9 employee because she was excluded from any discussions regarding subsequent rounds of vacancy postings. (Evans Aff. ¶ 20.)

### E.      February 2008: Plaintiff's Second Complaint to Karimi

In early 2008, plaintiff learned, or believed she had learned, that Champion had received a "quality step" increase from step 1 to step 4.  (Pl.'s SMF ¶ 32; Evans Aff. ¶ 28.)  She also heard that Besse was "posting" a higher grade position for one of the male employees in her division. (Evans Aff. ¶ 27.)  This information led plaintiff to again meet with Karimi.  (Pl.'s SMF. ¶ 32.)  In that February 8, 2008 meeting, she repeated her complaint about unequal treatment of male and female employees, specifically her belief that management was providing male employees with step increases or promotions and not providing similar increases to female employees and that male colleagues were given greater opportunities for professional development.  (Id. ¶ 32; Evans Aff. ¶ 32.)  Plaintiff also asked Karimi to consider her for a step increase.  (Pl.'s SMF ¶ 32.)  Karimi said he would talk to Human Resources, but he never got back to her with any additional information.  (Id.; Evans Aff. ¶ 28.)

### F.      Post-February 2008 Meeting

After February 2008, plaintiff continued to complain to Karimi about disparate treatment of male and female employees in terms of pay, promotions, and assignment of resources and high-profile work.  (Pl.'s SMF ¶ 40.)  Karimi's response in each instance was to reassign more and more of plaintiff's duties to Champion (id. ¶ 40), including strategic planning for the Storm Water Management Division (¶ 41), "front-burner reports" (¶ 42), plaintiff's role as DOE point-of-contact for MS4, a role with prominence and prestige, as that person is highly visible internally and by the public, briefs DDOE's Director, makes public presentations, and helps draft or negotiate legislation (¶ 46), the annual MS4 report (¶ 43), high-profile and high-visibility projects from the Water and Sewer Authority, such as the numerous issues surrounding the storm

water fee that funds the Storm Water Management Division, which required communicating with stakeholders and the general public (*id.* ¶ 44), confirming MS4 compliance by certain agencies (*id.* ¶ 47 ), and budgetary work (*id.* ¶ 49). Karimi also discouraged plaintiff from attending public hearings and meetings, but took Champion with him (*id.* ¶ 50), invited Champion, not plaintiff, to brief the Director on storm water management issues (*id.* ¶ 51), excluded plaintiff (the only engineer in the Division) from meetings and projects about technical engineering issues (*id.* ¶ 53), discouraged plaintiff from participating in a high-level storm water advisory panel meeting in late 2008, conducted by DDOE's Director and attended by directors of other agencies (*id.* ¶ 54); assigned Champion management of the Storm Water Management Task Force, giving him excellent exposure to high-level District staff and leaders and a unique opportunity to influence policy (id.¶ 55), and reassigned plaintiff's job as the EPA liaison to Champion and also assigned Champion the role of liaison for all the federal government. (Id. ¶ 57.) During this entire time, plaintiff and Champion were the only two employees in the Storm Water Management Division. (*Id.* ¶ 15.)

### G. Denial of Competitive Promotion to Grade 13

In the spring of 2008, Karimi asked Fitzgerald Fant, DDOE's Human Resources Director and EEO Officer, about posting a position for a specific person, who was already a DDOE employee. (Pl.'s SMF ¶ 83.) After being advised by Fant that the position would have to be competitively awarded, Karimi issued Vacancy Announcement No. 10551 for a grade 13 "environmental protection specialist" in the Storm Water Management Division. (Pl.'s SMF ¶ 84; Pl.'s Opp., Ex. 16; Fant. Decl. ¶ 8.) The position, which was to be competitively awarded, opened for applications on April 25, 2008, with a "first screening date" of May 5, 2008. (Pl.'s

SMF ¶ 84; Pl.'s Opp., Ex. 16.)  After learning about the posting, plaintiff asked Karimi why he

was posting a grade 13 "environmental specialist" position with similar job responsibilities to

hers, while she was an "environmental engineer," but only at grade 12.  (Pl.'s SMF ¶ 85.)  She

was told by Karimi that "that position is not for you, I have someone else in mind," which

plaintiff assumed meant the position was intended for Dianne Davis, an employee who worked

for Karimi in the Natural Resources Administration.  (*Id.*; Pl.'s Aff. ¶ 15.)  Plaintiff was also

prompted by the posting to ask Karimi where she fit in at the Storm Water Management Division

and whether she would be getting more opportunities for professional development.  (Pl.'s SMF

¶ 85.)  In response, Karimi told plaintiff:  "if you want professional development, go across the

street," which plaintiff took to be a reference to the fast-food restaurants located across from

their offices."[5]  (*Id.*)

Plaintiff applied for the grade 13 environmental specialist position.  (Pl.'s SMF ¶ 84; Fant

Decl. ¶ 8.)  On May 19, 2008, the Department of Human Resources sent a certification list to

Karimi, the selecting official.  (Pl.'s SMF ¶ 86; Fant Decl. ¶ 8 & Att. 4.)  Plaintiff was on that

list, along with Davis and two other applicants.  (Pl.'s SMF ¶ 86; Fant Decl. ¶ 8 & Att. 4).  Of

the four candidates on the certification list, Davis was the only "non-residency preference

candidate," which meant that she could only be selected if no "residency preference candidate"

was available.  (Pl.'s SMF ¶ 87; Fant Decl., Att. 4.)  In addition, only plaintiff had already been

performing the duties of the position for over a year.  (Pl.'s SMF ¶ 86.)  Plaintiff was never

interviewed (Pl.'s SMF ¶ 88.  In November 2008, Karimi posted a term-limited grade 13

_____

[5]Karimi denies making this statement, but for summary judgment purposes the Court
must assume all disputed facts are resolved in plaintiff's favor.

"environmental engineer" position in the Storm Water Management Division which he suggested plaintiff apply for. (Evans. Aff. ¶ 57.) She declined because the position was not a "career" position; ultimately no one applied and the position was closed. (*Id.*; Fant Decl. ¶ 9.) Then, in early December 2008, she received a letter notifying her that Vacancy 10551 had been cancelled. (Pl.'s Opp., Ex. 17 (12/2/08 Letter from Human Resources to Julia Evans).)

Despite deciding to cancel the grade 13 environmental specialist position for which plaintiff had applied, on November 14, 2008, Karimi sought authorization to issue a new vacancy announcement for a grade 13 "environmental specialist." (Pl.'s SMF ¶ 90; Fant Decl. ¶ 10 & Att. 2.) At the same time, he also sought authorization to list a vacancy for a grade 13 "environmental engineer" and a grade 12 "environmental specialist." (Pl.'s SMF ¶ 90; Fant Decl. ¶ 10 & Att. 2.) Although these were to be "competitive" positions, Karimi intended each for a current DDOE employee: "there was a grade 13 "environmental engineer" position "to promote [plaintiff]"; a grade 13 "environmental specialist" position "to promote Dianne Davis"; and a grade 12 "environmental specialist" position "to promote Jonathan Champion." (Pl.'s SMF ¶ 90; Fant Decl. ¶ 10 & Att. 2.) All three positions were authorized. Plaintiff applied only for the engineer position; she was selected, and her promotion took effect as of January 18, 2009. (Evans Aff. ¶35; Fant Decl. ¶ 10 & Att. 2.) Davis applied and was selected for the grade 13 environmental specialist position; Champion applied and was selected for the grade 12 environmental specialist position. (Pl.'s SMF ¶ 91.)

## H. Denial of Non-Competitive Promotion from Grade 12 to Grade 13

During the same period of time as plaintiff's application for the grade 13 environmental specialist position was pending, plaintiff sought a non-competitive promotion from Grade 12 to

Grade 13. As of May 2008, plaintiff had held her position as an environmental engineer, grade 12, for one full year, making her "eligible" for a non-competitive promotion to grade 13. (Pl.'s SMF ¶ 79.) In June 2008, plaintiff received a professional engineering license from the District of Columbia. (*Id.* ¶19.) After she received her license, plaintiff asked Karimi to consider promoting her non-competitively to a grade 13 as she had been in her grade 12 position for over a year and the Department of Environment was hiring males with professional engineering licenses at grade 13. (*Id.* ¶¶ 35, 79.) She told Karimi that she felt she should be at the same level as the licensed male professional engineers. (*Id.* ¶ 79.)

On July 17, 2008, plaintiff sent an e-mail to Karimi "confirm[ing] her understanding of [their] conversation th[at] morning" that Karimi "ha[d] not made a formal inquiry or request about [her] non-competitive promotion," but that he would "further inquire today with [Human Resources] personnel about [her] promotion from a 12 to a 13." (Pl.'s Opp., Ex. 21, at 2.) Karimi proceeded to e-mail Fant in Human Resources, asking whether plaintiff "was entitled to a non-competitive promotion to grade 13 or [if] it should be advertised." (*Id.*) On July 28, 2008, Karimi e-mailed Fant asking whether he had had "a chance to look into this question." (*Id.* at 1.) On July 29, 2008, Fant responded:

> I spoke with Julia regarding this matter and explained to her that the department is not currently implementing any non-competitive promotions. If a specific program has a need and vacancy to hi[re] someone at a higher grade level they can via a competitive process. We are currently working on a final draft of the promotion policy and it will probably be another 4 weeks before it is implemented. Also, we will be moving employees onto the new pds [position descriptions] once classified. Thereafter the department will consider non-competitive promotions.

(*Id.*) Karimi forwarded Fant's e-mail to plaintiff. (*Id.*) Plaintiff never received a non-competitive promotion from grade 12 to grade 13. In May 2009, the department issued its first

formal promotions policy establishing "the policy and procedures for the promotion of staff within the District Department of the Environment." (Fant Decl. ¶ 5; Def.'s Mot., Ex. H (Promotions Policy).)

## I.     May 2008 Performance Evaluation

On May 23, 2008, plaintiff met with Karimi to discuss her evaluation for the period April 2007 to March 2008. (Pl.'s SMF ¶ 65.) Karimi had downgraded from "role model" to "excellent" plaintiff's self-evaluation in several areas. (Pl.'s Opp., Ex. 11.) In addition, although Karimi's comments were generally positive, he had removed some of her accomplishments and included a few negative comments, such as "sometimes letters and memos require additional editing," "because of her desire to get the work done she can be brusque with fellow co-workers," "I [Karimi] had to meet with her to facilitate a better working relationship with DDOE colleagues," and "I [Karimi] suggest that [plaintiff] continue to work on her interpersonal skills." (*Id.*) Plaintiff was shocked by these statements, and she asked Karimi why he had not brought them to her attention before. (Pl.'s SMF ¶ 65.) Plaintiff objected to her evaluation and did not sign the form. (*Id.*; Pl.'s Opp., Ex. 11.) On May 29, 2008, she sent Karimi a follow-up e-mail setting forth her specific objections, providing him "with additional detail," and asking him to "revise the content of the review to more fully reflect my performance." (Pl.'s Opp., Ex. 12.) To plaintiff, Karimi's comments reflected a bias against a woman who did not conform to certain "sex stereotypes," as well as a bias against non-native English speakers. (Pl.'s SMF ¶ 67.)

On June 2, 2008, plaintiff sent DDOE's Chief of Staff, Chris Carew, an e-mail requesting a meeting on a confidential basis. (Pl.'s SMF ¶ 70; Pl.'s Opp., Ex. 20.) At a June 10, 2008

meeting, plaintiff told Carew her concerns about the unfairness of her evaluation and that she believed it was biased, sexist and discriminatory. (Pl.'s SMF ¶ 70.) Carew told plaintiff that he would speak with DDOE's Director. (Id. ¶ 71.) On June 13, 2008, unbeknownst to plaintiff, Karimi forwarded plaintiff's evaluation and her comments "upstairs" to the Director of DDOE and to Human Resources for further review. (Pl.'s Opp., Ex. 19.) Upon learning this, plaintiff e-mailed Carew a copy of her evaluation, her written response, and her prior year's evaluation. (*Id.*) Her e-mail stated that it "was still [her preference to find a resolution as confidentially and amicably as possible so that [she could] continue to move forward in the [Storm Water Management Division]." (*Id.*) Plaintiff met with Carew again on June 23, 2008, and asked for his help in addressing her concerns. (Pl.'s SMF ¶ 73.) Plaintiff never heard anything further about her evaluation from Carew or anyone else in the Department. (*Id.*)

### J.    Formal Complaint

On October 18, 2008, plaintiff filed an intake questionnaire with the D.C. Office of Human Rights. (*Id.* ¶ 37; Pl.'s Opp., Ex. 9) It alleged that Karimi favored white, male employees with less seniority and experience in the assignment of work, transferred plaintiff's duties to male coworkers, and denied her repeated requests for promotions and raises equal to those provided to male employees. (*Id.* ¶ 38.) Plaintiff's attorney told the General Counsel of the Department of Environment about plaintiff's complaint on November 24, 2008. (*Id.* ¶ 38.)

On December 15, 2008, Fant sent an e-mail to plaintiff advising her that because of his "previous knowledge of your intent to possibly report an EEO claim . . . , I think it would be best if another District Government EEO Counselor investigate your claim should you decide to file one." (Def.'s Mem, Ex. I.) Fant provided plaintiff with a link to a list of EEO Counselors whom

she could contact.  (*Id.*)

K.     **Post-October 2008 Evidence of Discrimination and/or Retaliation**

In late 2008/early 2009, Karimi reassigned some of plaintiff's responsibilities to Davis, such as managing responses to the EPA audit.  (Pl.'s SMF ¶ 58.)  In or around February 2009, Karimi and Besse involved several of plaintiff's male co-workers in working on a Department of Transportation issue related to catch basins, but excluded plaintiff although she was an engineer and the Department of Transportation liaison.  (*Id.* ¶ 59; Pl.'s Opp., Ex 15.)

II.    **Procedural History**

On May 12, 2009, plaintiff filed suit against the District of Columbia, alleging that defendant had (1) discriminated against her based on her sex and/or national origin; and (2) retaliated against her for engaging in protected activity, in violation of both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. and the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.*  In a later filing, plaintiff clarified that she was limiting her claims of discrimination and retaliation as follows: (1) discrimination and/or retaliation based on the significant reduction of her duties and responsibilities, beginning in November 2007 and continuing to the present; (2) discrimination and/or retaliation based on the denial of her request for a non-competitive promotion from grade 12 to grade 13; (3) discrimination and/or retaliation based on the cancellation of the competitive grade 13 environmental specialist position rather than selecting her to fill it; and (4) retaliation based on her May 2008 performance evaluation.  (Pl.'s Clarification of Claims at 1-2, May 28, 2010.)[6]  Defendant has moved for summary judgment on

_____

[6]Plaintiff withdrew her claims under the Equal Pay Act (Compl. ¶¶ 29-32), under the DCHRA for discrimination based on sexual orientation (Compl. ¶¶ 24-25), any claim arising out of other job postings, and any claim relating to the salary she was given when she was promoted

all claims.

## ANALYSIS

I.    **LEGAL STANDARDS**

A.    **Summary Judgment**

Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a judgment as a matter of law.'"  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) and Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  *Holcomb*, 433 F.3d at 895 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the non-moving party – here plaintiff – and draw all reasonable inferences in her favor. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

B.    **Discrimination Based on Sex or National Origin**

Under  Title VII, it is an "unlawful employment practice for an employer . . . to

_____

to grade 13.  *(See* Pl.'s Clarification of Claims at 2 (citing Compl. ¶¶ 17, 20, 24-25, 29-32).)

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . or national origin." 42 U.S.C. § 2000e-2. The "two essential elements" of a discrimination claim under this section are "that (I) plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . sex [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).[7] "A plaintiff must prove both elements to sustain a discrimination claim." *Id.*

Under the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), plaintiff "must [first] establish a prima facie case of discrimination." *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). A plaintiff establishes a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman* , 511 F.3d 151, 156 (D.C. Cir. 2007). Once plaintiff makes out a prima facie case, the burden shifts to defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *see Reeves*, 530 U.S. at 142.

If the defendant satisfies its burden, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves,* 530 U.S. at 142-43 (internal quotations and citations omitted); *see also Brady v. Office of Sgt. at Arms*, 520 F.3d 490, 494 n.2 (D.C. Cir. 2008) ("In a Title VII

---

[7]The DCHRA similarly prohibits "discriminat[ion] against any individual, with respect to . . . compensation, terms, conditions, or privileges of employment" based upon sex or national origin. D.C. Code § 2-1402.11(a)(1). Courts analyze the claims using the same legal framework. *See Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999).

disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – and should not – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."); *Baloch*, 550 F.3d at 1197 n.2.

"[I]n considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494; *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (to "survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.")  The evidence to consider includes (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff.  *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).).  However, the plaintiff need not present evidence in each of these categories to avoid summary judgment.  *Aka*, 156 F.3d at 1289.  Rather, the court should assess the plaintiff's challenge to the employer's explanation "in light of the totality of the circumstances of the case," keeping in mind that  "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Reeves*, 530 U.S. at 147 ("[O]nce the employer's justification has been eliminated, discrimination may well

be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.")

### C. Retaliation

Under Title VII, it is an "unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The "two essential elements" of a retaliation claim under this section or under the DCHRA[8] are that plaintiff has "suffered (1) a materially adverse action (2) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.

The same *McDonnell-Douglas* burden-shifting framework applies to claims of retaliation. *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010). Plaintiff establishes a prima facie case of retaliation by showing "that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Again, once plaintiff makes out a prima facie case, the burden shifts to the employer "to articulate some legitimate, non[retaliatory] reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *see Reeves*, 530 U.S. at 142. If the employer satisfies that burden, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." *Jones*, 557 F.3d at 677.

---

[8]The DCHRA contains a similar anti-retaliation provision. *See* D.C. Code § 2-1402.61.

## II.     REDUCTION IN PLAINTIFF'S DUTIES AND RESPONSIBILITIES

Plaintiff claims that Karimi discriminated and/or retaliated against her when he significantly reduced her duties and responsibilities beginning in September 2007 and continuing to the present.[9]  Defendant seeks summary judgment on these claims on the basis that plaintiff has not established that she suffered an "adverse employment action" or a "materially adverse action."  On the discrimination claim, defendant also argues that, even if there was an adverse employment action, (1) plaintiff has not produced evidence from which one could draw an inference of discrimination based on sex or national origin; and (2) plaintiff  has not rebutted defendant's legitimate non-discriminatory reason for any adverse action.

### A.     Adverse Employment Action – Discrimination Claim

An "adverse employment action" is "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009); *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ).  It requires that the employee "experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Douglas*,

---

[9]In her complaint, plaintiff also alleged that defendant's conduct violated Title VII and the DCHRA by creating a "hostile work environment."  (Compl. ¶¶ 24, 35).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1).  It appears that plaintiff is no longer pursuing her hostile work environment claim, as she does not include it in her clarification of the claims she "intends to pursue" (Pl.'s Clarification of Claims, May 28, 2010), and she offers no opposition to defendant's argument that it is entitled to summary judgment on any such claim.  It therefore must be treated as conceded.

559 F.3d at 552 (internal quotations omitted); *see Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). "Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count." *Forkkio*, 306 F.3d at 1131. For example, "[m]ere idiosyncracies of personal preference are not sufficient to state an injury." *Id.* And "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Id.* (internal citations and quotations omitted). In a case where the claim is that a reassignment of duties amounts to an "adverse employment action," the critical question is whether the reassignment left the employee with "significantly different and diminished - supervisory and programmatic responsibilities." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). Generally this is a jury question unless the Court determines that no reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities. *Id.* (citing *Holcomb*, 433 F.3d at 902).

Defendant argues that plaintiff has not established an "adverse employment action" because "the undisputed facts clearly establish that the plaintiff was not fired and did not experience a decrease in salary, grade level or benefits as a result of the reduction in some of her duties"; that "plaintiff has consistently been offered positions at a higher grade throughout her tenure at DDOE"; that the workload of the division required hiring additional employees in addition to plaintiff; that "[n]aturally, the work that plaintiff had to perform was reduced as it was assigned to new employees"; and that "[plaintiff's] role in negotiating the MS4 permits and some of her involvement in other projects were assigned to [] Champion, [but] her duties, in the wake of group's expansion, did not constitute qualitatively inferior work requiring any less skill or knowledge." (Def.'s Mem. at 25-26.) As defendant sees it, the present case is governed by

*Baloch*, where the Court of Appeals upheld summary judgment for the defendant on the ground that even though the employee's responsibilities had changed due to the hiring of another employee, his duties "did not constitute qualitatively inferior work requiring any less skill or knowledge." *Baloch*, 550 F.3d at 1197. In addition, defendant argues, the present case is far afield from *Czekalski*, where the Court of Appeals recognized a potentially viable discrimination claim based on evidence that after a lateral reassignment, the employee "had gone from overseeing 260 federal employees, 700 contractors, 50 programs and a $400 million budget, to overseeing fewer than 10 employees and one program with a minimal budget." *Baloch*, 550 F.3d at 1197.

Defendant's premise for this argument is that it is undisputed that plaintiff's revised duties "did not constitute qualitatively inferior work requiring any less skill or knowledge," as was the case in *Baloch*. (Def.'s Mem. at 25-26.) This is not, however, the case. Plaintiff has produced ample evidence to support her claim that beginning in November 2007, she was "stripped of almost all strategic planning duties, excluded from meetings with her supervisors on personnel planning for the department, and excluded from participating in meetings and briefings with high-level officials, important contractors, and the D.C. Council," and that her "exclusion from important projects drastically changed the substance and level of her responsibilities" and left her with fewer opportunities for advancement and to develop professionally. (Pl.'s Opp. at 10.) The evidence, when viewed in the light most favorable to the plaintiff, puts this case somewhere between *Baloch* and *Czekalski*. A reasonable juror could conclude that what happened to plaintiff amounted to an adverse employment action. Accordingly, it is for a jury to decide whether plaintiff's diminished duties and responsibilities rose to the level of an adverse

employment action, and defendant is not entitled to summary judgment on this claim.

**B.    Materially Adverse Action – Retaliation Claim**

A "materially adverse" action for purposes of a retaliation claim is not the same as an "adverse employment action" required to bring a discrimination claim.  Rather, it is an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 68 (2006); *see also Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008).  Because of this distinction, "the proscription against retaliation sweeps more broadly than the proscription against discrimination."  *Gaujacq*, 601 F.3d at 577 (citing *Burlington*, 548 U.S. at 66-67); *Baloch*, 550 F.3d at 1191.  Having concluded that the reduction in plaintiff's duties was potentially significant enough to constitute an "adverse employment action," it follows that plaintiff has also established the "materially adverse action" necessary to support a retaliation claim.

**C.    Inference of Discrimination Based on Sex or National Origin**

Defendant's next argument is that even if plaintiff suffered an adverse employment action, she has failed to establish the third prong of a prima facie case of discrimination – that the action gives rise to an inference of discrimination based on sex and/or national origin. (Def.'s Mem. at 15.)  Defendant bases its argument on plaintiff's failure to "demonstrate that similarly situated employees were not treated equally."  (*Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).)  However, it is well-established that although "[O]nce method by which a plaintiff can satisfy the third prong of [the prima facie] test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class . . . this is not the only way."  *Czekalski*, 475 F.3d at 366; *George v.*

*Leavitt*, 407 F. 3d 405, 412 (D.C. Cir. 2005). Moreover, as the Court of Appeals recently reiterated, establishing a prima face case is "not onerous." *Brady*, 520 F.3d at 494 n.2. Here, although the evidence is not overwhelming, there is sufficient evidence from which one could infer that the reduction of plaintiff's duties and responsibilities resulted from a discriminatory animus, given the allegations of Karimi's differing treatment of plaintiff and Champion; his comments about plaintiff's "brusque" manner and need to improve her writing skills; and his statement that plaintiff overheard indicating that he did not believe someone with a strong accent could be a good manager. (Pl.'s SMF ¶¶ 66, 67.)

### D. Legitimate, Non-Discriminatory Reason for Adverse Action

Defendant argues for the first time in its reply that summary judgment is warranted because it has proffered a legitimate, non-discriminatory, non-retaliatory reason for the reduction in plaintiff's duties. According to defendant, the "legitimate non-discriminatory reason" for the reduction in plaintiff's duties is that the reduction was the natural consequence of the need to hire additional staff to bring the Storm Water Management Division up to the proper staffing level. (Def.'s Reply at 2.) Plaintiff's claim, though, is not that the hiring of additional staff and consequent reduction of her duties was itself discriminatory or retaliatory, but that Karimi discriminated and retaliated against her by stripping her of significant and meaningful responsibilities and giving them to Champion, a white male, who had been hired at a lower grade than plaintiff and was not an engineer. Accordingly, as defendant has not proffered a legitimate, non-discriminatory reason for that adverse action, summary judgment on this ground is denied.

### III. DENIAL OF A NON-COMPETITIVE PROMOTION

Plaintiff's second claim of discrimination and/or retaliation is based on defendant's

failure to give her a noncompetitive promotion from grade 12 to grade 13, despite her eligibility for such a promotion as of May 2008, her having obtained a professional engineer's license in June 2008, the hiring of other engineers in the department at grade 13, and the posting of an grade 13 "environmental specialist" position in the Storm Water Management Division in April 2008.

Defendant seeks summary judgment on the ground that "plaintiff cannot satisfy the elements for a prima facie case of failure to promote." (Def.'s Mem. at 17.) According to defendant, plaintiff has not met her burden because she has "failed to produce any record evidence indicating that any similarly situated employee, who was not a woman or not of Peruvian descent, received a non-competitive promotion prior to May of 2009." (Def.'s Mem. at 18.) As discussed *supra*, identifying a similarly situated employee who has been treated differently is one, but not the only way, to raise an inference of discrimination. *Czekalski*, 475 F.3d at 366; *George v. Leavitt*, 407 F. 3d at 412.

In any event, the *McDonnell Douglas* prima facie factors fall by the wayside once defendant articulates a legitimate, nondiscriminatory/nonretaliatory reason for its action. *Brady*, 520 F.3d at 493-94. Defendant's proffered reason is that prior to the adoption of a promotions policy in May 2009, no non-competitive promotions were being given in the Department. (Fant Decl.¶ 5 ("Without a policy, DDOE did not promote any employees without competition.").) Rather, defendant claims that during that period, "all employees who sought a higher grade were required to apply for an open (posted) position." (*Id.*) As defendant has "asserted a legitimate, non-discriminatory reason" for denying plaintiff a non-competitive promotion, the "central question" for the Court is whether plaintiff has "produced sufficient evidence for a reasonable

jury to find" that the reason for the denial of her non-competitive promotion was not the lack of any promotions policy, but rather discrimination based on sex or national origin or retaliation. *Brady*, 520 F.3d at 494.

To meet her burden, plaintiff asserts that "DDOE competitively and non-competitively promoted employees prior to May 2009" (Pl.'s Opp. at 22), but she cites no persuasive evidence in support of that assertion. Rather, the evidence plaintiff relies on shows only that there were promotions prior to May 2009, not that there were any non-competitive promotions. (Pl.'s Opp. at 22 & nn. 5, 6 (citing Ex. 22[10]).)[11] Indeed, plaintiff admits as much when she states that "[t]here is no evidence that prior to May 2009, the DDOE had never promoted employees without competition." (*Id.* at 22.)

The Court must consider plaintiff's challenge to the employer's explanation "in light of the totality of the circumstances of the case." *Reeves*, 530 U.S. at 147. Judged by this standard, the Court concludes that plaintiff has failed to produce any evidence that contradicts defendant's proffered legitimate, non-discriminatory reason. In addition, it is significant that defendant's reason was provided to plaintiff contemporaneously with the decision to deny her a non-competitive promotion. Finally, there is no evidence suggesting a discriminatory or retaliatory animus on the part of Fant, the ultimate decisionmaker.

---

[10]As described by plaintiff, Exhibit 22 shows that "in DDOE's Department of Natural Resources, there were at least 22 promotions received by Environmental Specialists and Environmental Engineers between May 19, 2007 and March 29, 2009." (Pl.'s Opp. at 22.)

[11]In two footnotes, plaintiff cites to documents that do not appear to have been provided to the Court. (*See* Pl.'s Opp. at 22 nn. 5, 6.) In addition, it does not appear from plaintiff's descriptions that is not evident from the description provided by plaintiff that they show any non-competitive promotions occurred during the relevant time period.

Accordingly, the Court concludes that there is no basis from which a reasonable juror could conclude that defendant's lack of a promotions policy prior to May 2009 was not the reason plaintiff was denied a non-competitive promotion.

## IV.    DENIAL OF A COMPETITIVE PROMOTION

Plaintiff's third claim is based on defendant's failure to award her a competitive promotion when she applied for the grade 13 "environmental specialist" position in May 2008. Defendant first argues that plaintiff has failed to establish a prima facie case of discrimination or retaliation. Generally, to establish a prima facie case of discriminatory or retaliatory non-selection or failure to promote, plaintiff must show that "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." *Holcomb*, 433 F.3d at 895. In defendant's view, plaintiff cannot establish either the third or fourth elements of a prima facie case because the position was cancelled without being filled. According to plaintiff, however, Karimi's decision to cancel the position without filling it came about once she made the certification list and it became apparent that she was the most qualified person on the list and that the "residency preference" would prevent Karimi from selecting Davis for the job over plaintiff. In addition, at approximately the same time the position was being cancelled, a new vacancy for a grade 13 environmental specialist was announced, which was filled by Davis. Based on these facts, plaintiff argues that the "cancellation" was in fact a "rejection" and that "someone filled the position," albeit pursuant to a new vacancy announcement.

The function of the prima facie case is "limited to eliminating the two most common

26

nondiscriminatory reasons for a plaintiff's rejection: 'an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)). "Elimination of these reasons for the refusal to hire . . . is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.* (quoting *Int'l Bhd.*, 431 U.S. at 358 n.44.) As the fourth element is intended in part "to eliminate non-selection cases in which there was no available vacant position," *Lewis* 653 F. Supp. 2d at 73 (citing *Cones*, 199 F.3d at 516), courts have recognized that a defendant cannot avoid liability for discriminatory non-promotion by cancelling a position if there is evidence that the employer did, in fact, have an available vacant position. *See Carter v. George Washington Univ.*, 387 F.3d 872, 883 (D.C. Cir. 2004); *see also Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 74 (D.D.C. 2009) ("a plaintiff may satisfy the fourth element of the prima facie case through evidence that the employer did, in fact, have an available vacant position, notwithstanding the cancellation of a vacancy announcement"). Plaintiff has produced such evidence. At or near the same time the grade 13 environmental specialist position plaintiff had applied for was cancelled, Karimi sought (and received) authority to post a vacancy for a grade 13 environmental specialist. (Pl.'s SMF ¶ 90.) There were no material differences between the two postings. Accordingly, plaintiff has produced evidence that despite the cancellation of the position for which she had applied, there was still a vacancy in the Storm Water Management Division for a grade 13 environmental specialist. That evidence suffices to establish the third and fourth elements of plaintiff's prima facie case.

"Once the plaintiff has established a prima facie case, the burden shifts to the defendant

to produce evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason." *Holcomb*, 433 F.3d at 896. Defendant's proffered reason is that budgetary constraints in fiscal year 2008 prevented it from filling the position for which plaintiff applied, but that with the start of the new fiscal year, it was able to repost the position. (*See* Fant Decl. ¶¶ 8-9 ("[D]ue to a shortage of funds, the position posting was closed without a selection. The position was reposted in the following fiscal year"); *see also* Pl.'s Mem., Ex. 5, at 75 (Dep. of Fitzgerald Fant) ("In 2008 we were going through some budget challenges and [I] was asked to cut our budget by the Executive Office of the Mayor, and we were really looking at positions and managers had to justify positions they wanted to fill.").) Once defendant has articulated a legitimate, nondiscriminatory reason for its action, the critical question is whether plaintiff has produced evidence from which a reasonable jury could find that defendant's reason is pretextual: that is, that the reason for the denial of her competitive promotion was not budgetary constraints, but rather discrimination or retaliation.

In this instance, plaintiff has produced sufficient evidence to call into question defendant's proffered reason for not filling the grade 13 position. For example, Fant testified at his deposition that he did not "recall there being a freeze on promotions or pay increases specifically." (Pl.'s Mem., Ex. 5, at 75 (Dep. of Fitzgerald Fant).) In addition, Karimi's statement to plaintiff in May 2008 that the grade 13 environmental specialist position was intended for Davis along with his suggestion that she apply for a term-limited grade 13 position in late 2008 provide support for plaintiff's theory that the true reason the position was cancelled to avoid giving it to her. (Pl.'s SMF ¶ 85; Evans Aff. ¶ 57.) Moreover, defendant provided no

contemporaneous reason for cancelling the position; the reason first appeared in this litigation.[12]

Finally, it is not apparent whose decision it ultimately was not to fill the position, but, to the

extent it was Karimi's, there is evidence of discriminatory and/or retaliatory animus on his part.

(Pl.'s SMF ¶¶ 66, 67.)

Considering the evidence "in light of all the circumstances," the Court is persuaded that

plaintiff has produced sufficient evidence to raise jury issues as to the question of whether

defendant cancelled the grade 13 environmental specialist position for either discriminatory or

retaliatory reasons.

## V.    PERFORMANCE EVALUATION

Plaintiff's final claim is that defendant's May 2008 performance evaluation was unlawful

retaliation. Defendant seeks summary judgment on the ground that performance evaluations are

not actionable retaliation unless they have affected the employee's grade or salary. (Def.'s

Mem. at 23 (citing *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir 2003).) Although *Taylor*

applied the "adverse employment action" test to the retaliation claim before it, not the "broader"

"materially adverse action" standard adopted by the Supreme Court a few years later in

*Burlington Northern*, 548 U.S. at 68, defendant is correct that plaintiff's May 2008 performance

evaluation cannot support a retaliation claim.

In *Taylor v. Solis*, the Court of Appeals held that for a performance evaluation to be

"materially adverse, it must affect the employee's 'position, grade level, salary, or promotion

---

[12]Defendant states in its brief that "[p]laintiff was informed of the fact that a hiring freeze had be[en] enacted." (Def.'s Mem. at 18 (citing Compl. ¶ 15 ("Karimi responded by telling her promotions had been frozen.")).) However, it is clear from the context that the allegation in paragraph 15 refers to her request for a non-competitive promotion from grade 12 to grade 13, not her application for the grade 13 environmental specialist position.

opportunities.'" 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch*, 550 F.3d at 1199).

Thus, an employee who simply receives a lower performance evaluation than she believes is

deserved has no claim for retaliation. *See id.* (rejecting retaliation claim based on fact that

employee's evaluation had been lowered from "outstanding" to "excellent" and then to "fully

effective," absent any evidence that she had been denied promotion or bonus opportunities as a

result); *Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) (no retaliation claim based on

interim, oral assessment that employee was "borderline unacceptable"). In contrast, where an

evaluation exposes an employee to "removal, reduction in grade, withholding of within grade

increase or reassignment," a retaliation claim may proceed. *Porter*, 606 F. 3d at 819 (retaliation

claim allowed based on interim evaluation notifying employee of "unacceptable performance,"

because, against policy, evaluation was placed in employee's file and employee was thereby

exposed to material consequences.")

Plaintiff has many complaints about her May 2008 performance evaluation, but nowhere

does she contend that it affected her "position, grade level, salary, or promotion opportunities."

Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claim based on

her May 2008 performance evaluation.

## CONCLUSION

Accordingly, and for the reasons stated above, defendant is entitled to summary judgment

on plaintiff's non-competitive promotion and performance evaluation claims, but her claims

based on a reduction of duties and the denial of a competitive promotion may proceed. An

appropriate Order accompanies this Memorandum Opinion.

_____/ s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:      December 9, 2010